Darrell BEDONI and his parents, Sidney Bedoni and Lena Bedoni, husband and wife, Plaintiffs–Appellants,

v.

NAVAJO–HOPI INDIAN RELOCATION COMMISSION, an independent administrative agency for the United States of America, Ralph Watkins, Sandra Massetto, and Hawley Atkinson, as Commissioners of the NHIRC, and Christopher Bavasi, as Executive Director thereof, Defendants–Appellees.

No. 87–1818.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Nov. 10, 1987.

Decided June 20, 1989.

Richard M. Grimsrud, Flagstaff, Ariz., for plaintiffs-appellants.

Maria A. Hzuka, Dept. of Justice, Washington, D.C., for defendants-appellees.

Before GOODWIN and FLETCHER, Circuit Judges, and KING *, Senior District Judge.

SAMUEL P. KING, Senior District Judge:

## INTRODUCTION

When this matter last appeared before the panel, we concluded that the redress sought by plaintiffs, i.e., monetary relief in excess of $10,000 against a United States agency, divested the district court of jurisdiction under certain limiting provisions of the Tucker Act. *See* 28 U.S.C. §§ 1346(a)(2), 1491(a)(1). We therefore vacated the judgment of the district court and remanded for consideration of whether in the interest of justice the matter should be transferred to the court of claims.

■ On November 16, 1988, Congress enacted the Navajo and Hopi Indian Relocation Amendments of 1988. Section 10 therein provides an exception to the Tucker Act:

Notwithstanding any other provision of law, appeals from any eligibility determination of the Relocation Commission, *irrespective of the amount in controversy,* shall be brought in the United States District Court for the District of Arizona.

25 U.S.C. § 640d–14(g) (emphasis added) ("the Amendment").

Defendants argue that the Amendment should be presumed to effect a change in the law and that it should not apply retroactively to the case at bar. We disagree. The mere fact that Congress amended the Settlement Act does not indicate that it intended to change the law. It is the duty of a court in construing a statute to consider the time and circumstances surrounding the enactment as well as the object to be accomplished by it: *Callejas v. McMahon,* 750 F.2d 729, 731 (9th Cir.1984). This rule of statutory construction also applies to the interpretation of amendatory acts. *Id.* We think it clear that under the circumstances, the Amendment was intended as a clarification of the original Settlement Act and that we are now free to address the substance of plaintiffs' claims.

Prior to the Amendment, the Settlement Act was ambiguous inasmuch as it failed to state the court to which eligibility appeals were to be taken. However, Congress effectively directed the district court to develop expertise about the complex relocation process by expressly granting the district court jurisdiction over a wide range of disputes arising therefrom. *See, e.g.,* 25 U.S.C. §§ 640d–3(a), 640d–3(b), 640d–5, 640d–7 and 640d–17. It is therefore reasonable to assume that Congress also intended that the district court review appeals of relocation-benefits claims.

Further, the purpose of the Settlement Act was to "take into account all the social, economic, cultural, and other adverse impacts on persons involved in the relocation and ... to avoid or minimize [them]," *see* S.Rep. No. 1177, 93 Cong., 2d Sess. 35 (1974), and "to take cognizance of the hardships that the relocatees are subject to and

---

* The Honorable Samuel P. King, Senior United States District Judge for the District of Hawaii, sitting by designation.

develop procedures [accordingly]," *see* S.Rep. No. 1158, 95th Cong., 2d Sess. 4 (1978). The vast majority of relocatees do not have the resources to litigate their claims in the distant court of claims. We thus conclude that Congress's original intention was that all relocation-related matters, including relocation-benefits appeals, be brought in local district courts.

Principles of statutory construction further buttress our conclusion. Where, as here, an act is ambiguous, an amendment thereto " '[is] an indication that [it] is intended to clarify, rather than change, the existing law.' " *Callejas,* 750 F.2d at 731 (citing *Brown v. Marquette Sav. and Loan Ass'n,* 686 F.2d 608, 615 (7th Cir.1982)). *See also Begay v. Kerr–McGee Corp.,* 499 F.Supp. 1317, 1325 (D.Ariz.1980).

Here, Congress enacted the Amendment just three months after we determined that the Bedonis' appeal from the NHIRC's eligibility determination was within the exclusive jurisdiction of the court of claims. Faced with the ambiguity in the Settlement Act regarding the forum in which appeals from denials of relocation-benefits could be heard, we were constrained by the Tucker Act's grant of exclusive jurisdiction to the court of claims in cases where more than $10,000 was sought against a United States agency. Based on the foregoing considerations, it is manifest that Congress originally intended that relocation-benefits appeals arising prior to the Amendment also be heard in the district court, and that the Amendment is properly viewed as a legislative interpretation or clarification of the original Act. *See Callejas,* 750 F.2d at 731. The jurisdictional bar thus lifted, we address the merits of plaintiffs' claims.

## FACTS AND PROCEEDINGS BELOW

Sidney and Lena Bedoni ("the Bedonis") and their son Darrell Bedoni ("Darrell") (collectively "plaintiffs") appeal the district court's grant of the Navajo–Hopi Indian Relocation Commission's ("NHIRC") motion for summary judgment on Darrell's claim to replacement housing benefits and on the Bedonis' alternative claim to increased replacement housing benefits. We affirm the district court's judgment in part and reverse and remand in part.

In 1882 President Arthur established, by Executive Order, a 2.5 million acre reservation in northeastern Arizona for use by the Hopi Indians and "such other Indians as the Secretary of the Interior may see fit to settle thereon." Exec. Order of December 16, 1882. Members of the Navajo Tribe subsequently migrated to the reservation and settled. The Hopi and Navajo Tribes coexisted on the 1882 reservation for 75 years, but became entangled in a struggle as to which Tribe had a clear right to the reservation lands.

In 1962, after a thorough analysis of the controversy between the two Tribes, the U.S. District Court for the District of Arizona determined that the Hopi and Navajo Tribes held joint, undivided and equal interest in five-sixths of the reservation. *See Healing v. Jones,* 210 F.Supp. 125 (D.Ariz. 1962), *aff'd per curiam,* 373 U.S. 758, 83 S.Ct. 1559, 10 L.Ed.2d 703 (1963). The jointly held area is referred to as the Joint Use Area ("JUA"). The *Healing* court further determined that it could not partition the JUA; the original congressional act granting either Tribe the right to initiate a quiet title action did not give the court the power to do so. *See* Act of July 22, 1958, Pub.L. No. 85–547, 72 Stat. 403.

The establishment of the JUA failed to solve the inter-tribal conflicts over the lands thereon. Congress re-entered the fray in 1974 and passed the Settlement Act, which provided for the appointment of a mediator to assist in negotiating a settlement and partition of the JUA. *See* 25 U.S.C. §§ 640d—640d–28. In the event that the mediator's efforts failed, the statute granted the district court residual authority to make a final partition of the JUA. The Tribes were unable to reach a voluntary settlement, prompting the district court to enter a judgment of final partition in 1977, which we ultimately approved. *See Sekaquaptewa v. Mac-Donald,* 626 F.2d 113 (9th Cir.1980).

The Settlement Act directed the creation of the NHIRC, which was commissioned with the task of relocating Navajo and

Hopi residents who, as a result of the court-ordered partition, were located on lands allocated to the other Tribe. *See* 25 U.S.C. §§ 640d–12—640d–15. The scope of the NHIRC's authority included, among other things, the disbursement of funds equivalent to the "reasonable cost of a decent, safe, and sanitary replacement dwelling to accommodate [a displaced] household." *Id.* § 640d–14(b)(2).

The Bedonis, a Navajo family, applied to the NHIRC for relocation assistance benefits in 1977. In their application, the Bedonis originally listed three children as part of a five-person family to be relocated: Darrell, Emerson, and Norma, ages 16, 18, and 22, respectively.

Prior to receiving benefits in December of 1979, the Bedonis removed the names of their children from their application. The Bedonis assert that this modification was motivated by advice and encouragement rendered to them by officials of the NHIRC who informed them that their children were eligible for benefits in their own right and that the childrens' names should accordingly be deleted.

The Bedonis received a total benefit of $44,200. Of this amount, $38,700 was for replacement housing and corresponds to replacement-housing benefits given to a family of three or less persons.

In the interim between the Bedonis' application and receipt of benefits, Darrell and Emerson applied separately for relocation benefits. Darrell, age 18 and married at the time of his application, was denied benefits. The NHIRC affirmed the Certification Officer's denial of benefits upon internal administrative appeal. Emerson's application was initially denied. After having provided additional documentation of his residency, however, the NHIRC reversed its determination and granted him relocation benefits.

Norma applied for benefits in 1981. She too was determined to be ineligible. This denial was also affirmed on appeal within the NHIRC.

On October 17, 1985, plaintiffs commenced suit against the NHIRC, its three commissioners and its executive director.

For purposes of this appeal, plaintiffs' action sought district court review under the Administrative Procedure Act of the NHIRC's determination of Darrell's ineligibility. *See* 5 U.S.C. § 706. Alternatively, if Darrell was properly denied benefits, plaintiffs sought a declaration under 28 U.S.C. § 2201 and injunctive relief under 28 U.S.C. § 1361, requiring the NHIRC to pay the Bedonis an additional $18,300. This amount corresponds to the difference between replacement-housing benefits given families of four or more persons and what the Bedonis actually received.

Both parties filed motions for summary judgment. The district court entered judgment for the NHIRC on Darrell's claim to replacement-housing benefits in his own right and on the Bedoni's alternative claim for increased benefits. This appeal ensued. We address the two claims in turn.

## DISCUSSION

### A. Standard of Review:

In reviewing agency action, the reviewing court can reverse only if the agency action was arbitrary, capricious, an abuse of discretion, not in accordance with law, or unsupported by substantial evidence. *See* 5 U.S.C. § 706(2)(A), (2)(E). *See also Walker v. NHIRC*, 728 F.2d 1276, 1278 (9th Cir.1984). This court's review of a grant of summary judgment is *de novo. Squaxin Island Tribe v. State of Washington*, 781 F.2d 715, 718 (9th Cir.1986).

### B. Darrell's Claim to Benefits:

Pursuant to federal regulations in effect at the time of Darrell's application, a displaced person entitled to replacement-housing benefits had to be the head of a Navajo or Hopi household residing within the JUA and relocated as a consequence of the Settlement Act. 25 C.F.R. § 700.147 (1982). Residency was established by fulfilling either of the following criteria:

(1) Current Occupancy.

(2) Maintenance of substantial recurring contacts with an identifiable homesite although the individual is temporarily away for any of the following reasons:

(i) Employment....

(ii) Education....

*Id.* § 700.97.

The NHIRC Certification Officer denied Darrell's application for benefits because:

(1) He did not qualify as a resident;

(2) He was not a current occupant; and

(3) He did not maintain substantial contacts with an identifiable homesite.

■ For all relevant periods of time up to August 11, 1978, the date of Darrell's marriage, he remained an unemancipated minor. Prior to this date, Darrell could not qualify as a head of household and, therefore, was not entitled to replacement-housing benefits in his own right. *See Id.* § 700.69. The Certification Officer and the NHIRC, pursuant to an agency review of the Certification Officer's denial of benefits to Darrell, correctly concluded that any pre-emancipation claim that Darrell had to benefits was derived through his parents.

The NHIRC Hearing Officer on Darrell's agency appeal also determined that the fact that the Bedonis failed to include Darrell on their application while he was a minor did not give him the right to assert a separate ownership claim after his emancipation. The Hearing Officer concluded that such a result was not sanctioned by statute or regulation. This conclusion is neither arbitrary nor an incorrect interpretation of the law.

■ Darrell thus had standing to receive replacement-housing benefits after 1978— when he married and became a head of household. As to all relevant periods of time after Darrell was emancipated, the Hearing Officer determined that Darrell owned no homesite on the former JUA and was, for the most part, off JUA land for educational purposes. Darrell's contacts with the JUA were characterized by the Certification Officer as "infrequent, of short duration and for social purposes." On internal administrative appeal, Darrell's contacts were described as "so tangential as to be ephemeral" and "clearly recreational and social." These findings are not disputed and support a conclusion that Darrell, though a head of household, was not a resident after his emancipation. The NHIRC's determination in this regard was not arbitrary, capricious or unsupported by substantial evidence.

Plaintiffs cite two bases for reversible error, both of which are meritless. First, they argue that Darrell was a resident as defined by Arizona law, i.e., "residence ... [of a]n infant ... is that of his parents." *In re Webb's Adoption*, 65 Ariz. 176, 177 P.2d 222 (1947). Here, as described above, Darrell's pre-emancipation residency is irrelevant. Furthermore, federal statutory law defines residency for the purposes of conferring replacement-housing benefits and would preempt state law. The NHIRC's interpretation of its regulation is not incorrect.

Second, plaintiffs assert that the NHIRC failed to follow its own internal rules in the NHIRC Management Manual. Pursuant to subsection 206.62 of the Manual, an applicant is eligible for replacement-housing benefits if he "ceased to be a dependent and becomes a head of a household before the parent signed the Relocation Contract." Darrell satisfied this criterion. As pointed out by the NHIRC, however, this is but one of two criteria. The applicant must also qualify as a resident as a threshold matter. *See* NHIRC Management Manual § 206.6. As noted above, the NHIRC determined that Darrell failed in this regard and that determination was not arbitrary, capricious, an abuse of discretion or unsupported by substantial evidence.

Accordingly, we affirm the NHIRC's denial of replacement housing benefits to Darrell.

### C. Sidney and Lena Bedoni's Claim to Increased Benefits:

The Bedonis argue that if Darrell is not entitled to benefits in his own right because his claim to benefits properly derives from that of his parents, then they were "shorted" in the amount of benefits they received. They contend that they are entitled to the benefits that a family of four or more would have received. The Bedonis, however, signed a relocation application and contract seeking benefits given to fam-

ilies of three or less. The granting of benefits sought is hardly arbitrary, capricious, or an abuse of discretion.

The Bedonis nonetheless urge that the NHIRC should be estopped from denying them additional benefits because they justifiably relied on the encouragement and representations of NHIRC employees that their children should apply independently and that the children were entitled to benefits in their own right.

■ We need not and therefore decline to address the estoppel cause of action championed by the Bedonis. For a more fundamental reason we think it clear that the Bedonis should receive an opportunity to show that, had Darrell and Norma been included on the application, they would have been entitled to the benefits of a family of four or more persons. For the reasons set forth below, we hold that the NHIRC breached the fiduciary obligation it owed to the Bedonis as Native Americans entitled to benefits under the Settlement Act.

It cannot be gainsaid that the NHIRC owed a fiduciary obligation to all members of the Hopi and Navajo Tribes who were obligated to relocate from lands allocated to the other Tribe pursuant to the court-ordered partition. To begin with, it is hardly a novel proposition that the Secretary of the Interior and the NHIRC, as entities and representatives of the executive branch of the federal government, have a general trust relationship with Native American Tribes. The United States Supreme Court has repeatedly recognized "the distinctive obligation of trust incumbent upon the Government in its dealings with [Native Americans]." *Seminole Nation v. United States*, 316 U.S. 286, 296, 62 S.Ct. 1049, 1054, 86 L.Ed. 1480 (1942). *See, e.g., United States v. Mason*, 412 U.S. 391, 398, 93 S.Ct. 2202, 2207, 37 L.Ed.2d 22 (1973); *United States v. Candelaria*, 271 U.S. 432,

442, 46 S.Ct. 561, 563, 70 L.Ed. 1023 (1926); *Cherokee Nation v. Georgia*, 30 U.S. (5 Pet.) 1, 17, 8 L.Ed. 25 (1831). As a consequence of this general trust relationship, the Government is held to a high standard of conduct, one in keeping with its "moral obligations of the highest responsibility and trust." *Seminole Nation v. United States*, 316 U.S. at 297, 62 S.Ct. at 1054.

In addition to the longstanding general trust obligation that has dominated Government interaction with Native Americans, the language of the Settlement Act itself directly supports the existence of a fiduciary relationship.[1] For example, § 640d–9 declares that the lands allocated to the respective Tribes "shall be held in trust by the United States exclusively for [the respective Tribes]." 25 U.S.C. §§ 640d–9(a), 640d–9(b).

Similarly, § 640d–10, which provides for the acquisition of lands in close proximity to the reservation in order to compensate the Navajo Tribe for land lost pursuant to the relocation states that "title [to the acquired lands] shall be taken by the United States in trust for the benefit of the Navajo Tribe as a part of the Navajo Reservation[.]" 25 U.S.C. § 640d–10(a).

Section 640d–30 establishes the "Navajo Rehabilitation Trust Fund" to be composed of all of the net income derived by the Navajo Tribe from the surface and mineral estates of the lands acquired under § 640d–10. These funds, of which the Secretary of the Interior is the named trustee, are to be used "solely for purposes which will contribute to the continuing rehabilitation and improvement of the economic, educational, and social condition of [Navajos displaced by the partition and relocation]." 25 U.S.C. § 640d–30(b).

The undisputed general trust obligation, buttressed by the many grants of express trustee authority in the Settlement Act,

---

**1.** While present here, explicit use of the word "trust," or any other particular language, is not necessary:

> [W]here the Federal Government takes on or has control or supervision over tribal monies or properties, the fiduciary relationship normally exists with respect to such monies or

> properties (unless Congress has provided otherwise) even though nothing is said expressly in the authorizing or underlying statute (or other fundamental document) about a trust fund, or a trust or fiduciary connection.

*Navajo Tribe v. United States*, 624 F.2d 981, 987, 224 Ct.Cl. 171 (1980).

justify the imposition on the NHIRC of an affirmative duty to manage and distribute the funds appropriated pursuant to the Settlement Act such that the displaced families received the full benefits authorized for them. *See United States v. Mitchell,* 463 U.S. 206, 224–26, 103 S.Ct. 2961, 2971–72, 77 L.Ed.2d 580 (1982) (since Government owes Native Americans fiduciary duty with respect to management of reservation lands, Native Americans may sue for damages for mismanagement of timberlands on reservation); *McGinn v. Merrill Lynch,* 736 F.2d 1254, 1258 (8th Cir.1984) (at common law, fiduciary's failure to provide reasonably thoughtful or careful advice actionable, even though non-fiduciary's failure to do so not actionable).

On these facts we find that the NHIRC breached the affirmative duty—arising from its fiduciary obligation—to assist the Bedonis to receive the maximum benefits allowed them under the Settlement Act. The Bedonis originally listed all three of their children when they applied for relocation benefits. Sometime prior to signing the contract, they removed them. Ms. Yazzie, a relocation counselor, submitted her affidavit indicating that at the time that the Bedonis applied, it was NHIRC policy to encourage relocating families to have any children nearing the age of 18 and working or going to school apply for benefits on their own rather than as dependent children of their parents because it would be in their best interests to do so.

The NHIRC insists that it is a simple case of the Bedonis accepting the risk of having their children apply independently. We cannot accept this contention where a fiduciary, *pursuant to agency policy,* apprised them of the possibility of taking that risk, advised them how, and encouraged them to do it, and where the net outcome was that the Bedonis received nearly $20,-000 less than they were entitled to had they retained their children on their application.

In holding that the NHIRC breached its fiduciary obligation, we are mindful that the NHIRC and the entire relocation program have been wracked with problems since their inception. A 1978 Senate Report, issued pursuant to a Bill to amend the Settlement Act states:

> Extensive evidence was presented to the committee during 2 days of hearings to the effect that since the establishment of the [NHIRC] there has been a critical lack of effective cooperation, coordination, comprehensive planning and resource allocation.... This situation has resulted in social, economic, physical, and emotional hardship on the members of both the Navajo and Hopi tribes who are subject to relocation....
>
> The hearing record and field investigation indicate that the Commission has been plagued with conflicts between the Commissioners and their past Executive Directors resulting in a high turnover of Executive Directors.... [This situation has] resulted in unnecessary confusion and delay in the daily administration of the Commission.

S.Rep. No. 1158, 95th Cong., 2d Sess. 4 (1978).

The problems continued after 1978. A 1980 House Report declares that "[i]n the opinion of the managers [of the Committee of Conference] there has been a failure on the part of the executive branch to effectively carry out the terms of the Settlement Act." H.R.Rep. No. 1094, 96th Cong., 2d Sess. 11 (1980). In 1983, some six years after the Bedonis first applied for benefits pursuant to the Settlement Act, the regulations promulgated under the Settlement Act remained in a state of flux. The published notice proposing amendment of the regulations states:

> As a result of administrative review and court action, *it has become apparent to the Commission that the present rules are confusing, ill-defined and provide no certainty to applicants as to what constitutes eligibility.* The proposed revision is necessary to clarify the current rules and to bring the rules more closely in line with the language of the Act and intent of Congress.

48 Fed.Reg. 33,005 (1983) (to be codified at 25 C.F.R. pt. 700) (proposed July 20, 1983) (emphasis added).

In one of the earliest reported decisions concerning Native Americans' status *vis à vis* the federal government, Justice Marshall wrote: "Their relation to the United States resembles that of a ward to his guardian." *Cherokee Nation v. Georgia,* 30 U.S. (5 Pet.) 1, 17, 8 L.Ed. 25 (1831). This principle continues to instruct courts today when confronted with cases involving the federal-Native American relation.

In this context, we cannot say that the Bedonis, as wards of the Government—and, by extension, the NHIRC—were obligated to bear the risk of "confusing, ill-defined regulations" when they applied for relocation-housing benefits. Indeed, it was incumbent upon the NHIRC to manage and distribute the funds appropriated pursuant to the Settlement Act in such a manner that the Bedonis received the maximum amount of benefits available to them. This the NHIRC plainly failed to do when, pursuant to agency policy at the time, it encouraged the Bedonis to remove their children from their application and have them apply on their own.

Based on our review of the legislative history of the Settlement Act, we think it highly probable that, when the Bedonis applied in 1977, *no one* knew with any precision what constituted eligibility under the Settlement Act. The Bedonis should not and will not have to shoulder the burden of the NHIRC's failure in this regard.

It cannot be claimed that the Bedonis took a chance and "gambled" that they would receive more benefits if their children applied independently, for nowhere in the statute or in the regulations have we found a provision characterizing the application for replacement-housing benefits as a game of chance. The Bedonis were entitled to thoughtful, accurate advice on how to receive the benefits to which they were entitled, and the NHIRC, as a fiduciary, was required to and failed to provide it.

We, therefore, reverse the district court's judgment granting the NHIRC's motion for summary judgment on the Bedonis' alternative claim to increased housing benefits. We remand to the district court for further proceedings in conformity with this opinion. On remand, the district court should consider whether the Bedonis would have been eligible as a family of four or more persons had Darrell and Norma been included on the application. If so, the district court should direct the NHIRC to award the additional benefits.

JUDGMENT AFFIRMED IN PART, REVERSED IN PART AND REMANDED. COSTS TO BE AWARDED TO PLAINTIFFS–APPELLANTS.